IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

DANIELLE MARIE WALKER                                                                          PLAINTIFF

V.                                              NO. 15-5297

CAROLYN W. COLVIN,
Acting Commissioner of the Social Security Administration                       DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Danielle Marie Walker, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claims for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under the provisions of Titles II and XVI of the Social Security Act ("Act"). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. § 405(g).

**I.      Procedural Background:**

Plaintiff filed her applications for DIB and SSI on July 25, 2012, alleging disability beginning May 29, 2009, due to left and right knee problems, disc compression, depression, high blood pressure, sleep problems, numbness in the legs and feet, pain radiating to hips and right side, muscle spasms, and balance problems. (ECF No. 9 pp. 16, 221, 230, 275). An administrative hearing was held on January 28, 2014, at which Plaintiff appeared with counsel and testified. (ECF No. 9, pp. 34-91).

By written decision dated May 8, 2014, the Administrative Law Judge ("ALJ") found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe – degenerative disc disease, obesity, and affective disorder. (ECF No. 9, pp. 18-19). After reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (ECF No. 9, pp. 19-20). The ALJ determined Plaintiff retained the residual functional capacity ("RFC") to:

> perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except the claimant can occasionally climb, balance, stoop, kneel, crouch, and crawl. The claimant is also limited to work where interpersonal contact is incidental to the work performed, the complexity of the tasks is learned and performed by rote with few variables and little judgment involved. Supervision required is simple, direct, and concrete.

(ECF No. 9, pp. 20-26). With the help of the vocational expert ("VE"), the ALJ determined that during the relevant time period, Plaintiff would not be able to perform her past relevant work, but that there were other jobs existing in significant numbers in the national economy Plaintiff would be able to perform, such as contacts/inspector/tester, warehouse checker, and mail room sorter. (ECF No. 9, p. 27).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied her request on October 27, 2015. (ECF No. 9, p. 5). Subsequently, Plaintiff filed this action. (ECF No. 1). Both parties have filed appeal briefs, and the case is before the undersigned for report and recommendation. (ECF Nos. 10, 11, 12).

**II.   Evidence Presented:**

Tonograms of Plaintiff's left knee taken on February 6, 2004, showed two screws, placed in a previous procedure, in stable position with endosteal callus formation at the site, but no bony union. (ECF No. 9, pp. 366-67). On April 27, 2005, a laminogram of Plaintiff's

left knee suggested interval bony union. (ECF No. 9, pp. 350-51). Pre-surgery testing was conducted at St. john Medical Center on June 8, 2005, and Plaintiff underwent left knee surgery to remove the screws on June 15, 2005. (ECF No. 9, pp. 341-349).

Plaintiff visited St. John Medical Center on August 21, 2005, and complained of abdominal pain radiating to her back and right shoulder and nausea, vomiting, and diarrhea for the preceding four days. (ECF No. 9, pp. 336-40). An MRI was ordered to rule out a gallstone, although the results are not contained in the record, and she was diagnosed with acute abdominal pain. Id.

Plaintiff participated in a sleep study on November 15, 2006, ordered by Plaintiff's neurologist, Dr. Han Suk Koh, which showed Plaintiff suffered with very mild obstructive sleep apnea and periodic limb movement disorder. (ECF No. 9, pp. 822-24). The recommended course of treatment was a weight reduction program and good sleep hygiene. Id. The record does not contain any evidence indicating Plaintiff underwent another sleep study after November 15, 2006. Dr. Koh ordered an EMG and Nerve Conduction Report and Consultation for Plaintiff on December 7, 2006. (ECF No. 9, pp. 825-26). The report did not show any evidence of entrapment neuropathy, carpal tunnel syndrome, myopathy, or cervical radiculopathy. Id.

Plaintiff presented to Tyler Memorial Hospital on October 17-18, 2007, and complained of right upper quadrant pain after eating. (ECF No. 9, pp. 794-810). An ultrasound was conducted which showed fatty infiltration of the liver, and no gallstones. Id. A CT of Plaintiff's abdomen and pelvis showed no indication of acute disease, but also revealed that Plaintiff's sigmoid colon had a thickened wall, and showed scoliosis and advanced

degenerative disease of the spine. Id. Plaintiff was diagnosed with abdominal pain and not prescribed medication. Id.

On March 31, 2008, Plaintiff presented to Tyler Memorial Hospital and complained of chest pain. (ECF No. 9, pp. 477-79, 497-99, 781-93). A chest x-ray showed slightly coarsened lung markings, a normal sized heart, and no evidence of acute disease. Id. A right upper quadrant ultrasound showed mild fatty change of the liver, no gross abnormality of the pancreas, and a normal gallbladder. Id. Plaintiff was diagnosed with non-specific chest pain, advised about her blood pressure readings, and discharged without a new prescription. Id.

A stress electrocardiography and stress myoview were performed at Tyler Memorial Hospital on April 16, 2008. (ECF No. 9, pp. 489-92, 495-96, 812-13, 816-17). Neither test showed any evidence of exercise-induced myocardial ischemia. Id. More testing was conducted on April 22, 2008. (ECF No. 9, pp. 484-88, 493-94, 814-15, 818-20). Hepatobiliary imaging showed no evidence of cystic duct or common bile duct obstruction. Id. An echocardiogram showed normal left ventricular systolic function with no significant evidence of pathologic valvulopathy. Id. Right upper quadrant sonography showed mild hepatic fatty infiltration, a normal gallbladder and bile ducts, and a normal pancreas. Id. A screening mammogram conducted on April 26, 2008, showed no evidence of malignancy. (ECF No. 9. p. 811).

Plaintiff presented to Tyler Memorial Hospital on March 19, 2009, and complained of ankle and knee pain after she had fallen on her knee. (ECF No. 9, pp. 774-80). An x-ray of her left knee showed early degenerative changes, a tiny loose body, bony hypertrophic changes of the pretibial region proximally related to her previous surgery, and a normal right ankle with no evidence of acute disease. Id. Plaintiff was diagnosed with an acute sprain of her right ankle

4

and a contusion on her right knee with abrasion. Id. The record does not indicate whether Plaintiff was prescribed any medication upon discharge. Id. An x-ray of Plaintiff's pelvis conducted on March 27, 2009, showed mild degenerative changes of her left hip with narrowing of the joint space superiorly and laterally with calcifications adjacent to the proximal femur. (ECF no. 9, pp. 450-59). An x-ray of Plaintiff's ankle showed calcaneal spurring, but was otherwise normal. Id. An x-ray of Plaintiff's left knee detected Plaintiff's previous knee surgery but was otherwise unremarkable. Id. An x-ray of Plaintiff's right foot showed small plantar osteophyte formation on Plaintiff's heel bone but was otherwise unremarkable. Id. An MRI without contrast of Plaintiff's left knee taken on April 3, 2009, showed minimal joint effusion with a baker's cyst, but no evidence of a meniscal tear or other internal joint derangement. (ECF No. 9, pp. 448-49).

Plaintiff presented to Tyler Memorial Hospital on July 12, 2009, and complained of right flank pain. (ECF No. 9, pp. 765-73). No imaging was conducted and Plaintiff was diagnosed with acute lumbar strain and prescribed Flexeril 5mg tablets and Norco in an undisclosed dosage. Id. The next day, on July 12, 2009, Plaintiff presented to Tyler Memorial Hospital and complained of right flank and right lower abdomen pain. (ECF No. 467-75, 480-81, 745-64). Plaintiff's pregnancy test was negative. Id. An ultrasound was conducted of Plaintiff's right upper quadrant which showed minimal sludge in the gallbladder but was otherwise within normal limits. Id. A CT of Plaintiff's abdomen and pelvis showed no urinary tract calculi and prominent left lobe of liver with subcapsular decreased attenuation anteriorly in the left lobe, which raised the question of an old injury. Id. The remainder of the test was normal, but the imaging also showed scoliosis and advanced degenerative disease in the spine at the L4-L5 level. Id.

Plaintiff visited PhysicianCare on July 23, 2009, to follow-up from her hospital visit just over a week prior. (ECF No. 9, pp. 461-62). She was counseled for weight reduction, diet and exercise, and smoking cessation. Id. Plaintiff was diagnosed with hypertension, obesity, and cholecystitis. Id. Her treatment plan consisted of smoking cessation and blood pressure monitoring. Id. A consultation was scheduled to consider gallbladder removal. Id. She was prescribed Toprol 25mg oral tablets. Id.

On September 1, 2011, Plaintiff visited Baystate Mary Lane Hospital and complained of high blood pressure. (ECF No. 9, pp. 526-40, 581-602, 656-78). The records show Plaintiff's back was nontender with a normal range of motion, normal alignment, and no step-offs. Id. Her musculoskeletal exam showed a normal range of motion with no tenderness, swelling, or deformity. Id. Her gastrointestinal and neurological exams were normal as well. Id. Plaintiff was diagnosed with benign hypertension and discharged without a new prescription. Id.

Digital mammography conducted at Baystate Mary Lane Hospital on September 12, 2011, showed no evidence of malignancy. (ECF No. 9, pp. 580, 655). A PAP test conducted by the same hospital on September 20, 2011, was negative for intraepithelial lesions and malignancy. (ECF No. 9, pp. 656). A pelvic Doppler ultrasonogram and transvaginal ultrasound were conducted by Baystate Mary Lane Hospital on September 28, 2011, to investigate Plaintiff's right lower quadrant pain. (ECF No. 9, pp. 578-79, 652-53). The imaging showed a lobular hypoechoic lesion in the cervix which could represent a nabothian cyst containing hemorrhage or debris. Id.

Plaintiff began visiting Valley Human Services on November 7, 2011, which conducted an Outpatient Adult Comprehensive Assessment. (ECF No. 9, pp. 699, 704). Plaintiff reported she sought mental health services from 2003-2004 and was placed on antidepressants, but

6

reported she was not taking psychiatric medication at the time of the Assessment. Id. She reported she was unable to find a job without her LPN license. Id. Plaintiff also reported she was enrolled in online classes for Healthcare Administration. Id. Plaintiff was diagnosed as follows:

>     Axis I:     Adjustment Disorder with Depressed Mood
>     Axis IV:    socioeconomic stressors, problems with her primary support group
>     Axis V:     GAF 60

Id. Plaintiff again visited Valley Human Services on November 17, 2011. (ECF No. 9, pp. 705-06). Her Outpatient Individualized Action Plan showed the following diagnosis:

>     Axis I:     Adjustment Disorder with Depressed Mood
>     Axis II:    Borderline Personality Disorder
>     Axis IV:    socioeconomic stressors, problems with her primary support group
>     Axis V:     GAF 60

Id. No medication was prescribed and her treatment plan was limited to learning three new skills of interpersonal effectiveness. Id.

An ultrasound was conducted of Plaintiff's right upper quadrant on November 25, 2011, at Baystate Mary Lane Hospital. (ECF no. 9, pp. 577, 651). The ultrasound showed no evidence of cholelithiasis but the findings were consistent with diffuse hepatocellular disease or fatty infiltration of the liver. Id.

On December 8, 2011, Dr. Matthew Brackman, at Bystate Mary Lane Hospital, performed a diagnostic laparoscopy and laparoscopic cholecystectomy. (ECF No. 9, pp. 524-25, 575-76, 658-50). Plaintiff's gallbladder was removed and showed mild chronic inflammation and no gallstones. Id. Dr. Brackman identified a left ovarian cyst and some minor adhesions of the duodenum to the neck of the gallbladder. Id.

Plaintiff visited Valley Human Services on January 11, 2012, for an outpatient review. (ECF No. 9, pp. 707-08). She did not meet her goal to learn three new skills of interpersonal effectiveness and her goal was renewed for the next treatment period. Id.

A PAP test was conducted on March 2, 2012, at Baystate Medical Center. (ECF No. 9, pp. 646-47). The test was negative for squamous intraepithelial lesions. Id. The test showed a shift in flora suggestive of bacterial vaginosis. Id. The test interpreter noted endometrial cells present in a woman forty years old or older which could be associated with endometrium, hormonal alterations, or with endometrial/uterine abnormalities. Id.

Plaintiff presented to Baystate Mary Lane Hospital on March 12, 2012, and complained of a cyst on her back. (ECF No. 9, pp. 515-23, 558-74, 625-45). She was diagnosed with an abscess which was incised, drained, and packed. Id. She was prescribed Percocet 5mg/325mg tablets and Bactrim DS 800mg tablets. Id.

On April 14, 2012, Plaintiff presented to Baystate Mary Lane Hospital and complained of right hip pain after she heard a popping sound in her hip. (ECF No. 9, pp. 506-14, 542-57, 604-24). She was treated by Dr. Paul Gerstein. Id. At the time of her visit, Plaintiff was taking the following medications: Fish Oil 1000mg capsules; Lipitor 40mg capsules; Lopid 600mg capsules; Vitamin D 50,000iu capsules; Wellbutrin 100mg tablets; Albuterol Inhaler; Hydrochlorothiazide 25mg tablets; and Metoprolol 25mg tablets. Id. A physical examination revealed Plaintiff's hip was nontender with full range of motion and no deformity. Id. Plaintiff showed pain in her right hip when bearing weight but her gait was almost normal. Id. Imaging of her hip revealed a normal right hip but showed degenerative changes of the partially visualized lower spine. Id. Plaintiff was diagnosed with a hip strain and was given crutches to assist with walking. Id.

Plaintiff visited Valley Human Services on April 17, 2012, for an outpatient review. (ECF No. 9, pp. 709-10). She did not meet her goal to learn three new skills of interpersonal effectiveness and her goal was renewed for the next treatment period. Id.

Plaintiff visited Northwest Medical Center Bentonville on October 18, 2012, and complained of flank pain with a suspected renal stone. (ECF No. 9, pp. 690-96). The attending physician's physical exam was normal. Id. A CT scan of Plaintiff's abdomen and pelvis showed no acute disease and an inguinal hernia with no evidence of incarceration or strangulation and no evidence of kidney stones or ureteral stones. Id. Plaintiff was diagnosed with an inguinal hernia, lumbar strain, and muscle spasm. Id. She was prescribed Tramadol 50mg tablets for pain. Id.

Dr. Robert Karas conducted a consultative physical exam on February 18, 2013. (ECF No. 9, pp. 715-20). Dr. Karas noted Plaintiff was five feet five inches tall and weighed two hundred ninety-two pounds at the time of the exam. Id. Dr. Karas's objective exam findings were normal except for noting Plaintiff had irritable bowel syndrome symptoms and knee pain. Id. X-rays of Plaintiff's left and right knees were normal. Id. Dr. Karas noted mild to moderate scoliosis in the lumbar spine and marked loss of lordosis and disc space at L4-L5. Id. Plaintiff was diagnosed with bilateral knee pain, hypertension, depression, and mild lumbar arthritis. Id. Dr. Karas assessed light to mild limitations in walking, carrying, and lifting. Id.

Dr. Terry Efird conducted a consultative mental exam on February 26, 2013. (ECF No. 9, pp. 722-25). Plaintiff reported that she had last sought counseling in June of 2012, and that she was not taking any psychiatric medication. Id. She reported she was not receiving mental healthcare because of financial difficulty. Id. Dr. Efird observed Plaintiff walked with a cane at the consultation. Id. Dr. Efird diagnosed Plaintiff as follows:

9

    Axis I:   depressive disorder NOS
    Axis II:   deferred
    Axis V:   GAF 55-65

Id.

  Dr. Susan Daugherty, PhD., a non-examining state agency consultant, completed mental RFC assessments in regard to Plaintiff's initial DIB and SSI determinations, on February 27, 2013. (ECF No. 9, pp. 105-07, 121-23). She determined Plaintiff had the mental RFC to perform work where interpersonal contact is incidental to the work performed; complexity of tasks is learned and performed by rote, with few variables, and little judgment; and, where supervision required is simple, direct, and concrete. Id.

  Dr. Clarence Ballard, a non-examining state agency consultant, completed physical RFC assessments in regard to Plaintiff's initial DIB and SSI determinations, on March 19, 2013. (ECF No. 9, pp. 104-05, 120-21). He determined Plaintiff had the physical RFC for light work with no non-exertional limitations. Id.

  Dr. Jerry Henderson, Ph.D., a non-examining state agency consultant, completed mental RFC assessments in regard to Plaintiff's DIB and SSI determination at the reconsideration level on May 21, 2013. (ECF No. 9, pp. 141-43, 157-60). He determined Plaintiff had the mental RFC to perform work where interpersonal contact is incidental to the work performed; complexity of tasks is learned and performed by rote, with few variables, and little judgment; and, where supervision required is simple, direct, and concrete. Id.

  Dr. Ronald Davis, a non-examining state agency consultant, completed physical RFC assessments in regard to Plaintiff's DIB and SSI determination at the reconsideration level on May 22, 2013. (ECF No. 9, pp. 139-41, 156-57). He determined Plaintiff had the physical RFC for light work with no non-exertional limitations. Id.

Plaintiff visited Northwest Medical Center Bentonville on August 14, 2013, and complained of abdominal pain which had been worsening over the preceding five days. (ECF No. 9, pp. 733-42). A CT scan of the abdomen and pelvis with IV and oral contrast showed evidence of hepatic steatosis and bowel-containing umbilical hernia without evidence of incarceration or strangulation. Id. The treating physician's physical examination was normal. Id. Plaintiff was diagnosed with generalized abdominal pain and no discharge prescriptions were listed in the record. Id.

On March 7, 2014, Plaintiff saw Dr. Scott Estes at Mercy Clinic Primary Care and complained of high blood pressure. (ECF No. 9, pp. 836-37, 846-47). Plaintiff was prescribed Cozaar 100mg tablets. Id. Plaintiff returned to Mercy Clinic Primary Care on March 21, 2014, and again complained of high blood pressure. (ECF No. 9, pp. 835, 845). Dr. Estes prescribed her Hyzaar 100-25mg tablets and Lipitor 40mg tablets. Id. Plaintiff returned to Dr. Estes on April 18, 2014, and again complained of high blood pressure. Id. Dr. Estes referred Plaintiff to an OB/GYN, and the record does not indicate Plaintiff was prescribed any new medication. Id.

On April 29, 2014, Plaintiff visited Mercy Clinic Obstetrics and Gynecology Pinnacle Hills and complained of an ovarian cyst. (ECF No. 9, pp. 831, 841). Dr. Mendy Mack prescribed Plaintiff Microgestin FE 1mg-20mcg tablets and referred Plaintiff to general surgery. Id. On May 20, 2014, Dr. Mack performed a routine gynecological exam of Plaintiff. (ECF No. 9, pp. 829-30, 839-40). At the time of the exam, Plaintiff was taking the following medicaitons: Hyzaar 100-25mg tablets; Microgestin FE 1mg-20mcg tablets; Vitamin D3 1,000 unit capsules; Lipitor 40mg tablets; Calcium Carbonate/Vitamin D3; Zantac 150mg tablets; and Motrin 800mg tablets. Id. The record indicates Dr. Mack performed a cervical or vaginal cytopath but the records do not contain the procedure results. Id. Dr. Mack also scheduled a

pelvic and transvaginal ultrasound on May 22, 2014, but the results are not included in the record. (ECF No. 9, pp. 833-34, 843-44).

### III.    Applicable Law:

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. Vossen v. Astrue, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. Teague v. Astrue, 638 F.3d 611, 614 (8th Cir. 2011). We must affirm the ALJ's decision if the record contains substantial evidence to support it. Blackburn v. Colvin, 761 F.3d 853, 858 (8th Cir. 2014). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. Miller v. Colvin, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. Id.

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. § 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(3)(c). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Only if she reaches the final stage does the fact finder consider the Plaintiff's age, education, and work experience in light of her residual functional capacity. see McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982), abrogated on other grounds by Higgins v. Apfel, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

**IV.   Discussion:**

Plaintiff argues in this appeal that: 1) the ALJ erred in his determination of the Plaintiff's RFC. (ECF Nos. 11, 12).

### A.   Subjective Complaints and Credibility Analysis:

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the Eighth Circuit has observed, "Our touchstone is that [a

claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 946, 966 (8th Cir. 2003).

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors. The ALJ considered the Plaintiff's activities of daily living and noted the Plaintiff made breakfast, cared for her personal needs, prepared simple meals, did her laundry, and shopped for groceries, and that her hobbies included hiking, boating, and riding motorcycles. (ECF No. 9, pp. 22-23). The ALJ remarked that he recognized Plaintiff experienced some limitation but noted, "no physician placed any functional restrictions on her activities that would preclude work activity." (ECF No 9, p. 23). The ALJ further determined Plaintiff's treatment and degree of pain relief seeking behavior did not support her subjective complaints of pain and discomfort. (ECF No. 9, p. 23). Moreover, the ALJ determined Plaintiff's symptoms were adequately controlled by medication. (ECF No. 9, p. 23). The ALJ also considered the alleged side effects of Plaintiff's medications and determined they were mild and did not limit Plaintiff's ability to perform work activities. (ECF No. 9, p. 23). Lastly, the ALJ considered Plaintiff's contention that she lacked the resources to receive adequate treatment and to have her LPN license transferred from another state. (ECF No. 9, pp. 23-24). He determined that Plaintiff's purchase of cigarettes for daily consumption over the preceding twenty-five years was incompatible with the claim that Plaintiff could not afford healthcare or could not afford to pay the licensing fee to continue working as an LPN. (ECF No. 9, pp. 23-24).

Therefore, although it is clear that Plaintiff suffers with some degree of limitation, she has not established that she is unable to engage in any gainful activity. Accordingly, the Court

concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

### B.      ALJ's RFC Determination and Medical Opinions:

RFC is the most a person can do despite that person's limitations. 20 C.F.R. §§ 404.1545, 416.945. It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

In the present case, the ALJ considered and discussed the medical assessments of examining and non-examining agency medical consultants, Plaintiff's subjective complaints, and her medical records when he determined Plaintiff's RFC. In his opinion, the ALJ stated:

> While no listing now exists for obesity, SSR 02-1(p) requires consideration of obesity in determining whether a claimant has medically determinable impairments that are severe, whether those impairments meet or equal any listing, and finally, in determining the residual functional capacity. Obesity may have an adverse impact upon co-existing impairments. According to the testimony, the claimant is five feet six inches tall and weighs over 280 pounds, which places her in the obese category. (Hearing Testimony). Therefore,

15

> obesity has been considered and the limitations associated with said obesity incorporated below in the residual functional capacity.

(ECF No. 9, pp. 18-19). SSR 02-1(p) provides guidance for evaluating obesity. SSR 02-1(p) provides obesity can cause limitation of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. Obesity may also affect an individual's ability to do postural functions, such as climbing, balance, stooping, and crouching. Moreover, SSR 02-1(p) further provides that the combined effects of obesity with other impairments may be greater than might be expected without obesity.

While Plaintiff may not have initially alleged obesity as a disabling impairment with her initial application, she did testify that her weight imposed some restrictions, namely that she was unable to bend over to tie her shoes, could not bend to retrieve items off the floor, used a cane to ambulate and for assistance getting on and off the couch and into and out of bed, and that she had difficulty getting into and out of the bathtub and was unable to stand long enough to shower. (ECF No. 9, pp. 52-54). See Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cr. 2003)(Failure to allege limitation in function as a result of obesity resulted in waiver of the claim being raised on appeal where the Plaintiff neither alleged obesity as a disabling impairment in his application for benefits or during the hearing). As discussed more thoroughly above, the ALJ properly discounted Plaintiff's subjective complaints, such as those statements which allege Plaintiff is totally disabled and suffers any more limitations than those reflected in the ALJ's RFC determination. The ALJ considered the Plaintiff's activities of daily living and noted the Plaintiff made breakfast, cared for her personal needs, prepared simple meals, did her laundry, and shopped for groceries, and that her hobbies included hiking, boating, and

riding motorcycles. (ECF No. 9, pp. 22-23). The ALJ remarked that he recognized Plaintiff experienced some limitation but noted, "no physician placed any functional restrictions on her activities that would preclude work activity." (ECF No 9, p. 23).

After assessing Plaintiff's credibility and fully examining the evidence on the record before him, the ALJ is required to consider each of Plaintiff's severe impairments and all of her impairments in combination in determining her RFC. See Raney v. Barnhart, 396 F.3d 1007, 1011 (8th Cir. 2005). In the present case, the ALJ determined Plaintiff's obesity was a severe impairment on its own because he found it had more than a minimal impact on her ability to engage in work-related activities. (ECF No. 9, pp. 18-19). Plaintiff, in her brief, points to no medical evidence in the record suggesting she suffered any greater degree of impairment because of her obesity than that accounted for by the ALJ's RFC determination, other than her own hearing testimony. See Plaintiff's Brief (ECF No. 11). While Plaintiff correctly points out the combined effects of her obesity with her other impairments may be greater than expected without obesity, the record contains no objective medical findings to support her argument. Accordingly, this Court finds the ALJ's RFC with regard to consideration of Plaintiff's obesity is supported by substantial evidence on the record as a whole.

Further, the ALJ considered all of Plaintiff's physical impairments, those he determined to be severe and non-severe, in determining Plaintiff's RFC. The ALJ considered Plaintiff's numerous complaints of pain in her back and in her flank, and the medical imaging evidence showing advanced degenerative changes to Plaintiff's back. (ECF No. 9, pp. 20-26). The ALJ also considered the numerous complaints of pain in Plaintiff's abdomen and pelvis, as well as the medical imaging evidence showing no acute abnormalities, and the healthcare providers' objective physical exam results. (ECF No. 9, pp. 20-26). Although Plaintiff suffered a long

history of abdominal pain, the record indicates Plaintiff stopped having the recurring pain after her gallbladder was removed on December 8, 2011, except for when she was diagnosed with a hernia on October 18, 2012, and August 14, 2013. The ALJ also considered the opinion of Dr. Karas and the content of his consultative exam, in which Dr. Karas corroborated the extent of Plaintiff's back and knee impairments, but assessed Plaintiff with mild limitations. Id. Accordingly, this Court finds the ALJ's RFC assessment with regard to Plaintiff's physical limitations is supported by substantial evidence on the record as a whole.

Finally, the ALJ considered Plaintiff's mental health history and determined Plaintiff's affective disorder was a severe impairment. (ECF No. 9, pp. 20-26). The ALJ gave significant weight to the opinion of Dr. Terry Efird, who saw Plaintiff for a consultative exam. Id. The mental RFC assessed by the ALJ is consistent with both the opinion of Dr. Efird, and Plaintiff's mental health treatment history. Accordingly, this Court finds the ALJ's RFC assessment with regard to Plaintiff's mental limitations is supported by substantial evidence on the record as a whole.

The Court notes that in determining Plaintiff's RFC, the ALJ discussed the medical opinions of many treating physicians, surgeons, and specialists, as well as those of the non-examining state agency consultants, and set forth the reasons for the weight given to the opinions. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) ("It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians")(citations omitted); Prosch v. Apfel, 201 F.3d 1010 at 1012 (the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole). Based on the record as a whole, the Court finds substantial evidence to support the ALJ's RFC determination for the relevant time period.

### C. Hypothetical Question to the Vocational Expert:

After thoroughly reviewing the hearing transcript along with the entire evidence of record, the Court finds that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005). Accordingly, the Court finds that the vocational expert's opinion constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude her from performing the duties of a contacts/inspector/tester, warehouse checker, or mail room sorter. Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996) (testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

### IV. Conclusion:

Accordingly, the undersigned recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 14th day of October, 2016.

/s/ Erin L. Setser
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE